# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 27, 2025         Decided August 1, 2025

No. 23-3212

UNITED STATES OF AMERICA,
APPELLEE

v.

DAVID PAITSEL,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cr-00156-2)

———

*Linda Julin McNamara* argued the cause and filed the briefs for appellant.

*Katherine M. Kelly*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Matthew M. Graves*, U.S. Attorney, at the time the brief was filed, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, *Elizabeth A. Aloi*, and *John W. Borchert*, Assistant U.S. Attorneys.

Before: MILLETT and WILKINS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Dissenting opinion filed by Senior Circuit Judge RANDOLPH.

WILKINS, *Circuit Judge*: Defendant-Appellant and former Federal Bureau of Investigation ("FBI") Special Agent David Paitsel was given at least $6,500 by his friend, Brian Bailey, after providing Bailey with information about certain residential tenants that Paitsel obtained from the FBI's lawfully authorized access to the non-public Thomson Reuters information system known as CLEAR by representing that his searches were for FBI law enforcement investigative purposes. The primary issue in this appeal is whether Paitsel's conduct constituted bribery under 18 U.S.C. § 201(b)(2)(C), which prohibits public officials from agreeing to accept valuable compensation in exchange for performing an "official duty." We hold that, in this case, the Government proved beyond a reasonable doubt that Paitsel's conduct fell within his official duties because he performed an act made possible only by both (i) his official position in the FBI that gave him access to a specialized FBI database, and (ii) his affirmative representation while using that database, as required by law, that his conduct was part of official FBI law enforcement investigative duties. That satisfies the "official duty" prong even though Paitsel's conduct was technically outside the realm of his day-to-day tasks or functions. Paitsel's other challenges—a purported instructional error and the sufficiency of the Government's *quid pro quo* evidence—are also rejected. For the reasons that follow, we affirm Paitsel's convictions and sentence.

## I.

The District of Columbia has a number of tenants' rights laws, one of which is the Tenant Opportunity to Purchase Act

of 1980 ("TOPA"). TOPA provides that "[b]efore an owner of a housing accommodation may sell the housing accommodation or issue a notice to vacate for purposes of demolition or discontinuance of housing use, the owner shall give the tenant an opportunity to purchase the housing accommodation at a price and terms that represent a bona fide offer of sale." D.C. CODE § 42-3404.02(a) (2001). In other words, "[t]he right of a third party to purchase an accommodation is conditional upon exercise of tenant rights[,]" and can be blocked if tenants exercise their right to purchase the property first. *Id.* § 42-3404.04. TOPA also gives tenants wide latitude to "assign[] or sell[] th[e]se rights to any party." *Id.* § 42-3404.06. "Under TOPA, a tenant (or, as here, the assignee of a tenant) can create a binding contract by accepting the material terms of an owner's offer of sale," preventing the original third party from purchasing the property. *van Leeuwen v. Blodnikar*, 144 A.3d 565, 567 (D.C. 2016).

The D.C. Court of Appeals has described TOPA as establishing "the unrestricted right of a tenant to assign his or her rights." *Allman v. Snyder*, 888 A.2d 1161, 1168 (D.C. 2005). This is true even if assignees are real estate developers whose interests are not necessarily aligned with those of tenants. *Id.*; *see also Nawaz v. Bloom Residential, LLC*, 308 A.3d 1215, 1226 (D.C. 2024) (TOPA permits an assignee to "acquire[] these rights for the purpose of ensuring no one else could exercise them—not for the purpose of purchasing the property").

On May 15, 2019, FBI Special Agent David Paitsel was indicted by a grand jury for allegedly committing various bribery offenses, including conspiracy to commit bribery, 18 U.S.C. § 371 (Count 3), and bribery in violation of Paitsel's "official duty," 18 U.S.C. § 201(b)(2)(C) (Count 5). The

indictment alleged that Paitsel's co-defendant, Brian Bailey, bribed Paitsel and a local government official in exchange for information that would allow Bailey to identify and contact tenants whose residences were undergoing the TOPA process. Bailey was also charged with conspiracy to commit bribery under § 371, as well as bribery to induce Paitsel to violate his lawful duty, 18 U.S.C. § 201(b)(1)(C).

On September 28, 2022, both Bailey and Paitsel proceeded to jury trial. The evidence presented at trial established that Bailey sought to identify tenants whose property was for sale and thus had begun to proceed through the TOPA process. This allowed Bailey to purchase tenants' rights and, as assignee, sell those rights to a third-party purchaser at a profit. Bailey paid a local government employee in cash for unredacted TOPA notices, which allowed Bailey to identify tenants by name. Bailey then asked his good friend, Paitsel, to source the tenants' information, which Bailey used to reach out to tenants to seek assignment of their TOPA rights. Bailey later paid Paitsel about $6,500.

Paitsel found the information Bailey sought by searching for tenants' names on a Thomson Reuters information system called CLEAR. "CLEAR is a risk and fraud database that provides public record and proprietary information on people, businesses, phones, assets." D.A. 483. It aggregates this data from a variety of sources, including financial institutions such as credit bureaus. CLEAR data includes personally-identifying information ("PII"), such as birthdays, driver's license information, and Social Security numbers.

Federal laws, including the Gramm-Leach-Bliley Act ("GLBA"), limit financial institutions' disclosure of such information, including PII. *See* Pub. L. No. 106-102, 113 Stat. 1338 (1999) (codified in part at 15 U.S.C. § 6801); 15 U.S.C.

§ 6801 (restricting release of so-called "nonpublic personal information"); 16 C.F.R. § 313.3(n)(3)(i) (defining "nonpublic information" to include PII). These restrictions apply not just to financial institutions such as credit bureaus, but also to third parties that obtain and aggregate information from financial institutions, like Thomson Reuters. *See* 15 U.S.C. § 6802(c) ("[A] nonaffiliated third party that receives from a financial institution nonpublic personal information under this section shall not . . . disclose such information . . . unless such disclosure would be lawful if made directly to such other person by the financial institution.").

Thomson Reuters is one such example. Because information contained in CLEAR is derived in part from financial institutions, Thomson Reuters may only grant access to the database for reasons permitted under federal law. *See Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 102 n.2 (2d Cir. 2019) ( "Thomson Reuters . . . acknowledges that it is regulated by the Gramm-Leach-Bliley Act . . . ."). As such, the FBI's subscription to CLEAR only permits access to the database for law enforcement investigations, which is one of the authorized purposes under the GLBA for disclosure of the information to the FBI. *See* 15 U.S.C. § 6802(e)(5); D.A. 485–86.[1] Because the Department of Justice has law enforcement and investigatory functions, its contract with CLEAR supplies it with automatic access to sensitive information beyond what might be available to corporate or other authorized users.

---

[1] Bailey also paid another individual to conduct what is known as "skip tracing," that is, trying to find people whose contact information is missing or has changed. That individual used sources including whitepages.com, the Internet, and Lexis-Nexis, but he did not have access to CLEAR.

To ensure compliance with federal law, Thomson Reuters requires by contract that every user who logs into CLEAR, including FBI agents, first affirm that they have a statutorily authorized purpose for accessing sensitive data. After the user selects a permissible use, CLEAR shows a warning screen, which reads:

> To maintain compliance with the privacy provisions of the federal Gramm-Leach-Bliley Act and the subsequent regulations adopted by the Federal Trade Commission (GLB), a user must select only a single purpose from the presented list. Misrepresenting your access purpose is a violation of our subscriber agreement and certain federal and state laws. Any use of information maintained by West, a Thomson Reuters business, other than for the selected permissible purpose is grounds for account termination and may be referred to the appropriate governmental agency. Designated permissible purpose changes can be made at any time after logging in by clicking the refresh option on your browser.

D.A. 490. The user must acknowledge receipt of this message before they may search for information. If a user states that they have *no* permitted use, their access to information is restricted.

Even though the FBI "automatically get[s] a certain level of data" due to the agency's law enforcement functions, D.A. 493, agents still must select a permissible use each time they search CLEAR. FBI agents are trained and instructed that they may use CLEAR for official business only. Upon Bailey's request, Paitsel searched CLEAR for tenants' information on Bailey's behalf around 30 times. For nearly every search, he

averred that he had a law enforcement purpose for accessing the data. After Paitsel conducted the searches, he shared the tenants' information with Bailey.

On October 7, 2022, the jury unanimously found Paitsel guilty of both conspiracy to commit bribery and bribery. The District Court denied Paitsel's motion for a judgment of acquittal on February 21, 2023. On October 18, 2023, he was sentenced to two years' incarceration. This timely appeal followed.

**II.**

We begin with Paitsel's claim of instructional error, which is easily dismissed. Paitsel argues that the District Court erred when it instructed the jury that the third element of Count 5, bribery under § 201(b)(2)(C), required a finding "that Mr. Paitsel [acted] corruptly in return for being induced to violate his official duty not to use government resources for nonofficial business." D.A. 1146. This instruction, Paitsel contends, erroneously directed the jury to make a factual finding that Paitsel had an official duty not to use CLEAR for nongovernmental purposes. The argument continues that because this instruction defined the offense of § 201(b)(2)(C) bribery for the jury, it also infected the District Court's instructions as to Count 3, conspiracy to commit such bribery under § 371, which required, per the District Court's instructions, "that an agreement existed between two or more people to commit the crime of bribery." D.A. 1135. The Government argues that Paitsel has forfeited all but plain error review of this claim and that, on the merits, Paitsel fails to clear that high bar.

But Paitsel waived, rather than merely forfeited, any claim of instructional error. "While we review for plain error when a defendant has forfeited an issue through a failure to object,

we will not review at all when a defendant acts intentionally to waive an issue." *United States v. Thomas*, 999 F.3d 723, 732 (D.C. Cir. 2021). We refuse to review invited errors because they raise prudential concerns about fairness—the rule is an "equitable doctrine." *United States v. Long*, 997 F.3d 342, 353 (D.C. Cir. 2021); *see also Johnson v. United States*, 318 U.S. 189, 201 (1943) ("We cannot permit an accused to elect to pursue one course at the trial and then, when that has proved to be unprofitable, to insist on appeal that the course which he rejected at the trial be reopened to him."). As such, we raise invited error *sua sponte* "[b]ecause the rule is intended to prevent improper use of judicial machinery" and is thus "invoked by a court at its discretion." *Cf. New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation marks and citations omitted) (discussing judicial estoppel).

When a defendant deliberately induces the error below, such "invited error" constitutes waiver. "A party who challenges a jury instruction on appeal after having proposed the instruction's language commits 'a textbook case of invited error.'" *United States v. Benton*, 98 F.4th 1119, 1130 (D.C. Cir. 2024) (quoting *United States v. Maradiaga*, 987 F.3d 1315, 1322 (11th Cir. 2021)). Here, Paitsel requested the very instruction he now challenges. *See* Proposed Jury Instructions, *United States v. Paitsel*, No. 19-cr-156 (CKK) (D.D.C. Aug. 6, 2021), ECF No. 111, at 11, 17. The District Court adopted that instruction verbatim, D.A. 1146, and Paitsel did not object. Paitsel invited the instructional error of which he now complains, and has thus waived this claim.

## III.

Paitsel next disputes that the Government presented constitutionally sufficient evidence to allow a jury to convict him of bribery under § 201(b)(2)(C). When considering an

attack on the sufficiency of the evidence presented, we ask whether, "viewing the evidence in the light most favorable to the government, . . . any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Littlejohn*, 489 F.3d 1335, 1338 (D.C. Cir. 2007) (cleaned up). Our review is highly deferential as we must "give full play to the right of the jury to determine credibility, weigh the evidence[,] and draw justifiable inferences of fact." *Id.* Paitsel argues both that (1) insufficient evidence of the requisite *quid pro quo* was submitted to the jury, and (2) the Government failed to present sufficient evidence that he had an "official duty" not to use CLEAR for nongovernmental purposes. Both challenges ultimately fail to persuade us that reversal of Paitsel's convictions is warranted.

**A.**

Notwithstanding Paitsel's contrary arguments, sufficient evidence of a *quid pro quo* agreement was presented.[2] Bribery

---

[2] Although the Government argues that this challenge is subject to plain-error review, it was adequately preserved. In his motion below, Paitsel argued: "Even viewing the evidence in the light most favorable to the government, the evidence presented does not support a conviction for Bribery. The government's evidence of compensation, which at best may be characterized as a 'thank you,' do[es] not meet the elements required to obtain conviction on Count 5." S.A. 81. The District Court's ruling on the motion acknowledged that the relevant bribery statute requires "*quid pro quo* corruption, i.e., a specific intent to exchange a thing of value for an action in violation of a lawful duty." *United States v. Paitsel*, No. 19-cr-156 (CKK), 2023 WL 2139366, at *4 (D.D.C. Feb. 21, 2023) (cleaned up). It then concluded that "[t]he evidence is therefore more than sufficient to establish corrupt intent to accept payments *in exchange for* actions in violation of an official duty," *id.* (emphasis added). Paitsel thus raised—and the District Court decided—whether the

generally requires that "payments [are] made or agreed to *before* an official act in order to influence the official with respect to that future official act." *Snyder v. United States*, 603 U.S. 1, 5 (2024). This distinguishes bribes from "gratuities," which involve after-the-fact payments treated differently by law. *See id.* 18 U.S.C. § 201(b) requires that a defendant act "corruptly," which mandates proof "that the official have a corrupt state of mind and accept (or agree to accept) the payment intending to be influenced in the official act." *Snyder*, 603 U.S. at 11; *see also United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404–05 (1999) ("[F]or bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act.").

The parties' dispute boils down to whether the record supported the jury's finding that prior to Paitsel's conduct—searching CLEAR for tenants' information—he agreed to accept payment from Bailey in exchange for that information. Paitsel points out that the payments themselves postdated the conduct, and the Government replies that the timing of payments is irrelevant if the *promise* to pay predated the violation of an official duty. Paitsel agrees, but points to the absence of direct evidence that he formed such an agreement with Bailey before running the relevant CLEAR searches as undermining the jury's contrary finding. But the Supreme Court has made clear that "[t]he agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain." *McDonnell v. United States*, 579 U.S. 550, 572 (2016). "A jury could, for example,

---

Government presented sufficient evidence to allow a reasonable jury to find the requisite *quid pro quo*. *See Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 707–08 (D.C. Cir. 2009) ("Review here is thus appropriate because the district court 'passed upon' the in-person issue appellants now present to this court.") (quoting *United States v. Williams*, 504 U.S. 36, 41 (1992)).

conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return." *Id.*

Here, there was ample evidence from which a reasonable jury could have made a finding of *quid pro quo* beyond a reasonable doubt. Bailey's requests for information, and Paitsel's responses, spanned from February 2017 to May 2018. During this time, their communications repeatedly connected Paitsel's CLEAR searches to mutual monetary benefit. For instance, the jury heard evidence that in April 2017, Bailey wrote to Paitsel via email to discuss potential ways they could "make some money together." D.A. 523. In the same message, Bailey wrote: "The TOPA stuff is doing okay. Obviously, a lot depends on tracking people down. Even when I get to them there's no guarantee, but it only takes one or two to make it worthwhile." *Id.* He then provided Paitsel with the name of the tenant, and Paitsel responded with that individual's information.

In May 2017, Bailey requested another tenant's information from CLEAR, and Paitsel sent it the same day. The following day, Bailey emailed Paitsel to let him know that he was able to contact the tenant. He wrote, "If I get paid off of it, I'm going to give you 5K." D.A. 591. In the same message, he asked for further information about another tenant. Paitsel complied and sent back the information the same day. Months later, after Bailey made $40,000 from re-assigning that tenant's interest, he emailed Paitsel: "David, I will have the money tomorrow from the smaller deal. Do you want to meet this weekend so I can get it to you?" D.A. 593–94. Again in the same email, he flagged another tenant for Paitsel to search. As promised, Bailey withdrew $4,100 the next day and gave $2,500 to Paitsel.

12

In June 2017, Bailey emailed Paitsel to update him that he had successfully purchased the rights of a tenant whose information Paitsel had obtained on CLEAR. He wrote, "Hey bro. I owe you 5K. I found [the tenant] . . . . He assigned his rights over to me." D.A. 602. He then again asked for two new tenants' information. A few months later, Bailey provided Paitsel an update on this tenant, texting that the building was foreclosing and if he successfully sold his assigned rights, he would "give [Paitsel] 5K," as promised. D.A. 605. In December 2017, he confirmed to Paitsel via email: "Looks like we will get our money for 3021 15th Street Northwest between December 7th and the 12th. I owe you 5K on that." *Id.* Bailey further stated that another building "hopefully will close by the beginning of the year," and "[t]hat one will give you 1500 to 2500." *Id.* To that email Bailey attached three notices with tenant information and asked if Paitsel "can get anything on them." *Id.* Paitsel completed Bailey's request the same day by searching in CLEAR and responding. Bailey ultimately wrote Paitsel a check for $6,500 in January 2018.

Under our precedent, this evidence more than sufficed. In *United States v. Sutton*, we considered a § 201(b) conviction in a case where there was "no direct evidence of [the defendant's] intent at the time of the transfer" of money as payment, but where "there was considerable circumstantial evidence from which a jury could infer [the defendant's] knowledge that the money would be used to bribe government employees." 801 F.2d 1346, 1358 (D.C. Cir. 1986). While all parties involved "testified that they had no knowledge of illegality at the time of payment," we found significant in *Sutton* that the timing of the payment was "the same day" that defendant engaged in the culpable conduct. *Id.* at 1359. We further explained that irrespective of whether culpable conduct predated or postdated the money transfer, "either resolution allow[ed] a reasonable inference of [the defendant's] criminal intent," because under

both fact patterns, "[t]he central theme . . . is that the [conduct] *directly corresponded* to the receipt of money." *Id.* (emphasis added).

Similarly, in a conspiracy to commit bribery case involving a conviction under 18 U.S.C. § 371, we ruled that indirect evidence was "even more compelling evidence of an agreement" than the direct evidence presented. *United States v. Gatling*, 96 F.3d 1511, 1519 (D.C. Cir. 1996). There, third-party testimony established that one defendant (Jackson) connected third parties with the other defendant (Gatling), who provided them with housing subsidies for a $500 fee. Specifically, "[o]ne witness testified that she gave her $500 to Jackson, who then put the money in Gatling's pocket." *Id.* We held that "[t]he jury could legitimately have inferred an agreement to commit bribery between Gatling and Jackson from the fact that Jackson spread the word that section 8 subsidies were for sale and repeatedly brought individuals seeking subsidies to Gatling." *Id.*; *see also United States v. Dean*, 55 F.3d 640, 658 (D.C. Cir. 1995) (holding sufficient evidence supported § 371 conviction when jury could find a public official accepted money and "never paid it back," and the briber "benefited from [the official's] efforts," thus permitting the jury to find that the official "accepted the money in exchange for her performance of 'official acts'").

The nexus between Bailey's requests for information and his promise and eventual delivery of money represents conduct that "directly correspond[s] to the receipt of money." *Sutton*, 801 F.2d at 1359. Bailey referred to the money he paid Paitsel as "from the smaller deal," D.A. 594, and as being "owe[d]" due to Paitsel's provision of information, D.A. 605. He directly tied requests for information to cash, writing, "[t]hat one will give you 1500 to 2500." D.A. 605. And Paitsel, having received and responded to these communications, continued to

supply Bailey with the sought-after information. After Bailey wrote Paitsel a check for $6,500, which Paitsel accepted, Paitsel continued to search CLEAR on Bailey's behalf. Paitsel "accepted the money" Bailey gave him and Bailey clearly "benefitted from [Paitsel's] efforts." *Dean*, 55 F.3d at 658. The jury could, consistent with our precedent, reasonably infer from these facts that Paitsel and Bailey formed an agreement wherein Bailey promised Paitsel money in exchange for Paitsel's CLEAR research on his behalf.[3]

Paitsel nevertheless persists that "the evidence showed only that Bailey had asked Paitsel to help him find contact information for tenants and then, of his own accord, had rewarded Paitsel months later with payment after-the-fact when information that Paitsel had procured ultimately helped Bailey turn a profit." Appellant's Br. 34. But this reading of the record is only plausible as to Paitsel's initial CLEAR searches between February and April 2017, which preceded payment. *But cf.* Appellee's Br. 33–34 (arguing that even for these early searches, "[n]othing in the evidence precluded the

---

[3] This comports with out-of-circuit caselaw. *See, e.g.*, *United States v. Cianci*, 378 F.3d 71, 98 (1st Cir. 2004) (reasoning that based on the "juxtaposition" of two comments—one regarding conduct and one regarding payment—the jury could reasonably infer that the money paid was to serve as a bribe in return for official acts); *United States v. Lanci*, 669 F.2d 391, 393 (6th Cir. 1982) ("The contention that the evidence was insufficient to support conviction is based on the defense that the payments to the FBI employee were not made in return for her agreement to provide, and actually providing, confidential information[,]" but the jury "could infer that the payments were made for the stolen materials."); *United States v. Pacchioli*, 718 F.3d 1294, 1302–03 (11th Cir. 2013) ("jury could fairly determine" that defendant "expected to win the[] favor" of individuals based on "remarkable coincidence" of defendant's provision of valuable free goods and services).

jury from inferring that Paitsel obtained the information on the understanding that Bailey would pay him for it—particularly given their long-term friendship.").

And Paitsel offers no response at all on reply to the Government's rejoinder that "Bailey paid Paitsel on at least two occasions for providing tenant information which had helped Bailey contact and purchase tenants' TOPA rights." Appellee's Br. 35. The District Court instructed the jury that the Government did not have to correlate each of Bailey's payments to a specific violation of Paitsel's duties, and instead could "show a course of conduct, that is, a pattern" of such behavior. D.A. 1147. Paitsel has never challenged that instruction, nor does he explain why the various unrebutted instances involving a *quid pro quo* do not suffice to "show a course of conduct," even if not every CLEAR search was correlated to a discrete subsequent payment.

In light of the robust evidence, we conclude that the Government presented sufficient proof from which a reasonable jury could find beyond a reasonable doubt that Bailey promised Paitsel a bribe in exchange for Paitsel's research of tenants on CLEAR.

**B.**

Paitsel's remaining sufficiency-of-the-evidence claim is also unavailing, though it presents a statutory interpretation question of first impression. Recall that Paitsel was convicted of so-called "official duty" bribery and conspiracy to commit that offense, which forbids public officials from "receiv[ing], accept[ing], or agree[ing] to receive or accept anything of value . . . in return for . . . being induced to do or omit to do any act in violation of the official duty of such official or person." 18 U.S.C. § 201(b)(2)(C). Paitsel argues that his convictions are constitutionally infirm because the jury was not presented

with sufficient evidence that he was bribed to violate an "official duty." Specifically, he contends that the Government failed to put forward any evidence establishing that as an FBI agent, Paitsel had an official duty not to use CLEAR for the purposes that he did. In particular, Paitsel challenges the Government's invocation of "general ethical obligations" imposed on all Department of Justice employees, Appellant's Br. 38, arguing in favor of a narrower definition of "official duty" limited to his job functions. The Government counters that its evidence, including evidence that Paitsel was subject to ethics regulations that govern all federal employees' conduct, sufficed.[4]

"To allow a conviction to stand where the defendant's conduct 'fails to come within the statutory definition of the

---

[4] The Government again argues that Paitsel failed to raise this argument below and it should be subjected to plain-error review. We again disagree. The operative question is whether Paitsel "alert[ed] the district court to the specific arguments he advances on appeal." *United States v. Little*, 123 F.4th 1360, 1368 (D.C. Cir. 2024). In his motion before the District Court, Paitsel challenged the sufficiency of the evidence on various grounds. He argued that § 201 "is not intended to address the issues litigated in this trial, where Mr. Paitsel is alleged to have misused Government resources." S.A. 78 (cleaned up). He cites to *Valdez v. United States*, 475 F.3d 1319, 1324 (D.C. Cir. 2007) (en banc), for the proposition that "§ 201 is not about officials' moonlighting, or their misuse of government resources," which he argued was relevant to "what constitutes an official act," S.A. 78 n.5. And the District Court addressed this argument, holding that "[t]here was substantial evidence establishing the Paitsel understood that he was improperly accessing CLEAR in violation of a duty to use it only for FBI purposes in exchange for money payments," *Paitsel*, 2023 WL 2139366, at *4, and relying on evidence "that Paitsel was required to select an official reason for using CLEAR when he accessed the system" to support its ruling, *id.* This sufficed to preserve the issue.

crime,' or despite insufficient evidence to support it, would violate the Due Process Clause." *United States v. Hillie*, 14 F.4th 677, 683 (D.C. Cir. 2021) (quoting *Griffin v. United States*, 502 U.S. 46, 59 (1991)). As before, we "view[] the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor. Our inquiry is limited to the question of whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Dingle*, 114 F.3d 307, 310 (D.C. Cir. 1997) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (citation omitted). "[O]ur limited determination on sufficiency review does not rest on how the jury was instructed, but rather on how a properly instructed jury would assess the evidence." *Hillie*, 14 F.4th at 682 (cleaned up). The first step to our review is thus to determine the scope of the statutory term "official duty" under § 201(b)(2)(C).

**1.**

Although 18 U.S.C. § 201 was enacted in 1962, the federal bribery statute traces its roots back over a century prior. In 1853, Congress enacted a predecessor statute that, *inter alia*, forbade offering valuable collateral to a public official with the goal of influencing any matter "before him in his official capacity, or in his place of trust or profit." Act of Feb. 26, 1853, Sess. II, ch. 81 § 6, 10 Stat. 170, 171. By 1901, the statute expanded criminal liability to those who induced an official "to do or omit to do any act in violation of his lawful duty." 70 Rev. Stat. § 5451, Comp. Stat. of the U.S. 1901. The Supreme Court characterized these bribery provisions as proscribing "bribing an officer of the United States to do an act in violation of his official duty." *Benson v. Henkel*, 198 U.S. 1, 8 (1905). And as early as 1905, individuals were prosecuted under the bribery scheme for violating duties "to preserve and keep for the exclusive use of the" Government confidential records

relating to investigations. *Id.* at 9; *see also Haas v. Henkel*, 216 U.S. 462, 477 (1910) (reviewing jurisdictional basis for indictment, which alleged that defendants sought to obtain confidential government reports from a public official, who violated an official duty in disclosing them).

In 1914, the Supreme Court decided *United States v. Birdsall*, 233 U.S. 223, 231 (1914), where it interpreted § 201's predecessor statute, a law targeting "official[s] accepting bribe[s]," Act of Mar. 4, 1909, ch. 821 § 117, 35 Stat. 1109, which was later codified at 18 U.S.C. § 207. The Court held that official action need not "be prescribed by statute," but could be "governed by a lawful requirement of the Department under whose authority the officer was acting," and it was unnecessary "that the requirement . . . be prescribed by a written rule or regulation," but could be defined with reference to "an established usage which constituted the common law of the Department and fixed the duties of those engaged in its activities." *Id.* at 230–31 ("In numerous instances, duties not completely defined by written rules are clearly established by settled practice, and action taken in the course of their performance must be regarded as within the provisions of the above-mentioned statutes against bribery."); *accord United States v. Macdaniel*, 32 U.S. 1, 14–15 (1833) (recognizing that "usages have been established in every department of the government, which have become a kind of common law, and regulate the rights and duties of those who act within their respective limits").

We too construed § 201's predecessor statute broadly. In *Thomson v. United States*, we articulated a mandate that some *official* duty exist, such that a defendant could not be convicted of bribing an individual who was not a public official. 37 App. D.C. 461, 466–67 (D.C. Cir. 1911). We reasoned that when "Congress used the term 'official function,' it had reference to

acts official in character, something within the legal duty of the person performing them[,]" as opposed to those "acts or duties of an important nature . . . legally [e]ntrusted to persons not officers at all." *Id.* at 467. As to "function," we relied upon its ordinary meaning, which included, among other things, "the fulfilment or discharge of a set duty or requirement[,] the exercise of a faculty or office," and "that which one is bound or which is one's business to do." *Id.* For instance, in *Fall v. United States*, we affirmed the conviction of Secretary of the Interior Albert B. Fall for his role in the Teapot Dome scandal. 49 F.2d 506 (D.C. Cir.), *cert. denied*, 283 U.S. 867 (1931). There, we adopted the New York Court of Appeals definition, "giv[ing] to the statutory definition of bribery a construction broad enough to cover cases where a public officer has accepted a bribe to act corruptly in a matter to which he *bears some official relation*, though the act itself may be *technically beyond his official powers or duties*." *Id.* at 509–10 (emphasis added). As we summarized in an official immunity case:

> It is not necessary—in order that acts may be done within the scope of official authority—that they should be prescribed by statute or even that they should be specifically directed or requested by a superior officer. It is sufficient if they are done by an officer in relation to matters committed by law to his control or supervision, or that they have more or less connection with the general matters committed by law to his control or supervision, or that they are governed by a lawful requirement of the department under whose authority the officer is acting.

*Cooper v. O'Connor*, 99 F.2d 135, 139 (D.C. Cir. 1938) (internal quotation marks and citations omitted).

State-law cases echo this formulation of the official duty requirement. *See, e.g.*, *People v. Markham*, 30 P. 620, 621 (Cal. 1883) (affirming conviction where violation of official duty was "the duty of a police officer to arrest, with or without warrant, according to circumstances, every person who violates" the law, without reference to the defendant police officer's particular job functions); *Commonwealth v. Avery*, 18 N.E.2d 353, 354 (Mass. 1938) ("[W]here as here he acts under color of his office we think that a sufficient relation exists."); *State v. Potts*, 43 N.W. 534, 534 (Iowa 1889) (penalizing "any agreement by which [the officer] undertook to thwart the ends of justice by using his official position"); *People v. Clougher*, 158 N.E. 38, 40 (N.Y. 1927) (forbidding "the performance of or omission to perform any act whatsoever concerning which any discretion may be exercised by virtue of his actual relation to some official matter"); *State v. Nadeau*, 105 A.2d 194, 198 (R.I. 1954) (construing statute as restricting "the prohibited actions to those performed by a servant in relation to his official capacity with the city"). *But see State v. Butler*, 77 S.W. 560, 572 (Mo. 1903) ("[T]here must be a law in force, at the time of the attempted bribery, which imposes upon him the duty of acting in his official capacity, upon a subject-matter which may be brought before him.").

Many go further to hold that a defendant officer need not be authorized to perform an official duty, since his commission or intent to commit an *unauthorized* act in exchange for a bribe is even more culpable conduct. *See, e.g.*, *State v. Campbell*, 85 P. 784, 795 (Kan. 1906) (collecting cases); *State v. Ellis*, 33 N.J.L. 102, 103–06 (N.J. 1868); *People v. McGarry*, 99 N.W. 147, 149 (Mich. 1904); *State v. Hendricks*, 186 P.2d 943, 947 (Ariz. 1947) ("If he acts in his official capacity—and by this term is meant the doing of such acts as properly belong to the office and are intended by the officer to be official—the offense is complete. The validity or invalidity of the act to be done, or

whether the officer or the body in question had or had not jurisdiction, is generally immaterial."). For example, the Supreme Court of Washington affirmed a police officer's state bribery conviction and rejected the defendant's challenge that the Government failed to prove that he violated an official duty. *State v. Cooney*, 161 P.2d 442, 445 (Wash. 1945). There, the officer was convicted of accepting a diamond ring in exchange for releasing a prisoner from custody. The court upheld the conviction, reasoning that "[w]hether or not he did something which, as a police officer, technically he had no right to do is immaterial so long as the act was not entirely beyond his official duties as such officer." *Id.* Because the officer "was acting officially and because of his authority as a police officer," his actions went beyond his authority and "d[id] not exonerate him from prosecution under the statute against bribery." *Id.*; *see also* 5 J. Breckinridge Robertson, *Bribery*, *in* CYCLOPEDIA OF L. & PROC. 1041 (William Mack & Howard P. Nash eds., 1901–1912) [hereinafter CYCLOPEDIA OF L. & PROC.] ("[I]t has been held immaterial whether the officer had or had not jurisdiction . . . .") (defining bribery).

Prior to § 201's enactment, then, the wealth of federal and state authority supported the principle that "[a] bribery may be committed even though the officer in question has no particular duty with respect to the action desired, so long as the action pertains to subject matter over which he has a general duty." 3 WHARTON'S CRIMINAL LAW § 43:9 (16th ed. 2021). This construction further undermines Paitsel's contention that an "official duty" is circumscribed to a particular law enforcement officer's day-to-day functions and weakens his argument that using CLEAR was not part of his job responsibilities. *See Carter v. United States*, 530 U.S. 255, 267 n.5 (2000) (noting that if "Congress [had] simply punished 'robbery' or 'larceny' as some States have done," it would have had the effect of "leaving the definition of these terms to the common law"); *see*

*also Morissette v. United States*, 342 U.S. 246, 263 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."); LAFAVE, 1 SUBST. CRIM. L. § 2.2(d) (3d ed. Oct. 2024 update) ("[C]ourts interpret common law terminology in statutes according to its common law meaning rather than its everyday meaning, with the result that language which might at first blush seem ambiguous or vague takes on a quite definite meaning." (footnote omitted)); *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 101 (2011) ("[W]here Congress uses a common-law term in a statute, we assume the term comes with a common law meaning, absent anything pointing another way." (citation modified)).

It was against this backdrop that Congress reorganized the bribery statute in 1962. *See* Act of Oct. 23, 1962, Pub. L. No. 87-849, § 1(a), 76 Stat. 1119. This history is crucial because, as we have recognized, "[w]hen Congress next reorganized the bribery laws in 1962, it was well aware of previous bribery statutes and court interpretations of those statutes." *United States v. Neville*, 82 F.3d 1101, 1105 (D.C. Cir. 1996). "Committee reports from both Houses of Congress emphasized that the new bribery laws made 'no significant changes of substance' and 'would not restrict the broad scope of the present bribery statutes as construed by the courts.'" *Dixson v. United States*, 465 U.S. 482, 494 (1984) (quoting S. REP. NO. 87-2213, at 4 (1962); citing H.R. REP. NO. 87-748 (1961)).

The 1962 statute defined three different bribery offenses: bribery in exchange for (1) an "official act," (2) committing fraud, or (3) violating an "official duty." *See* § 201(c), 76 Stat.

at 1120 (codified at 18 U.S.C. § 201(c) (1964)). Today, 18 U.S.C. § 201(b)(2) is, in relevant part, nearly identical, exposing any public official to criminal liability who, "directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for" (A) performing "any official act," (B) committing fraud, or (C) "being induced to do or omit to do any act in violation of the official duty of such official or person."

In *Valdes v. United States*, our *en banc* Court construed "official act" under § 201(b) narrowly, rejecting the Government's bid to construe that element "to encompass essentially any action which implicates the duties and powers of a public official." 475 F.3d 1319, 1322 (D.C. Cir. 2007) (en banc). We disagreed with the Government's characterization of *Birdsall* as standing "for the proposition that every action within the range of official duties *automatically* satisfies § 201's definition," and clarified that "it merely made clear the coverage of activities performed as a matter of custom." *Id.* at 1323. Instead, we looked to 18 U.S.C. § 201(a)(3), which the Supreme Court construed in *Sun-Diamond Growers*, 526 U.S. at 404–414, and which defines "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." *Id.* We reasoned that the Court in *Sun-Diamond Growers* applied an "interpretive gloss" to "reject the government's theory that" the official act provision "covers any action taken in an official capacity." *Id.* Taken together, *Valdes* and *Sun-Diamond Growers* tell us that when Congress restructured the bribery statute, it carved out *official act* bribery as a narrower offense than the singular bribery offense that preceded § 201. Contrary to Paitsel's insistence otherwise, the

two cases view the bribery statute as a whole in a way that favors the government's argument here.

The *Valdes* Court reasoned that official duty bribery encompasses more conduct than official act bribery. There, the defendant was a police officer charged with official act bribery for "searching several police databases to supply otherwise publicly available information to" an FBI informant posing as a private party. *Id.* at 1320. The facts there were, in all relevant aspects, nearly identical to those at issue here. We reversed the defendant's conviction, however, because "an information disclosure is not in itself a decision or action on a question, matter, cause, suit, proceeding or controversy" that "may by law be brought before a public official" and so is not an official *act*. *Id.* at 1330 (citation modified). Paitsel and the dissent make much of the *Valdes* Court's statement that "§ 201 is not about officials' moonlighting, or their misuse of government resources[,]" *id.* at 1324, but we indicated that the decision "plainly continue[d] to allow bribery prosecutions when, for example, someone offers something of value to induce an official to provide information in violation of official *duty*," *id.* at 1327 (emphasis added). It was clear to the *en banc* Court, then, that the provision of information to a civilian was the sort of conduct that could constitute a violation of one's official duty, even if it would not comprise an official act.

This intuition squares with our precedent construing § 201's predecessor statute, *see Fall*, 49 F.2d at 509–10 (encompassing "cases where a public officer has accepted a bribe to act corruptly in a matter to which he bears some official relation, though the act itself may be technically beyond his official powers or duties"), as well as the construction of the term "official duty" in other federal bribery statutes. *See United States v. Carson*, 464 F.2d 424, 433 (2d Cir. 1972) ("There is no doubt that federal bribery statutes have been

construed to cover any situation in which the advice or recommendation of a Government employee would be influential, irrespective of the employee's specific authority (or lack of same) to make a binding decision.") (collecting cases).

For instance, the Meat Inspection Act, enacted in 1907 and amended in 1967, proscribes the receipt of valuable collateral by federal employees with meat inspection responsibilities that was "given with intent to influence his official action" or to influence "the discharge of any duty" provided for in the Act. 21 U.S.C. § 622. We distinguished the Meat Inspection Act's broad conception of "duty" from § 201's "official act" offense discussed in *Sun-Diamond Growers*, reasoning that "the Act does not place any restrictive definitional gloss upon what constitutes 'the discharge of any duty under the Act.'" *United States v. Schaffer*, 183 F.3d 833, 846 (D.C. Cir. 1999). Applying an ordinary-meaning analysis, we recognized that generalized statutory rulemaking authority "lacks the particularized focus of the term 'official act,'" and that "[t]hese duties extend beyond the mere development and promulgation of food safety regulations, and encompass an ongoing obligation to ensure enforcement in conformity therewith," such that "one could unlawfully attempt to influence the Secretary in the discharge of his broad-based duties without identifying any particular policy then at the regulatory fore." *Id.*; *accord United States v. Espy*, 145 F.3d 1369, 1371–72 (D.C. Cir. 1998) (same).

Moreover, the United States Code is replete with statutes that employ some variation of "official duty." For instance, 18 U.S.C. § 111(a)(1) has also been construed to require a nexus with the officer's generalized responsibilities, but not more. That statute forbids assaulting a federal officer "while engaged in or on account of the performance of official duties." *Id.* Courts have recognized that "[t]he parameters of the statutory

requirement that a federal official covered by the act must be engaged in the performance of his official duties are inherently fluid." *United States v. Boone*, 738 F.2d 763, 765 (6th Cir. 1984) (per curiam). Although "[t]here is no bright-line test to define performance of official duties," *United States v. Hoffer*, 869 F.2d 123, 125 (2d Cir. 1989) (cleaned up), several Circuits have adopted the framework that "[e]ngaged in performance of official duties is simply acting within the scope of what the agent is employed to do. The test is whether the agent is acting within that compass or is engaging in a personal frolic of his own." *United States v. Heliczer*, 373 F.2d 241, 245 (2d Cir.), *cert. denied*, 338 U.S. 917 (1967) (cleaned up); *see also United States v. Reid*, 517 F.2d 953, 964 (2d Cir. 1975) ("It was thinking in terms of what the officer ought to do because of being an officer.").

In construing "official duties" under § 111(a)(1), Courts of Appeal have cautioned against "occupational pigeonholing." *United States v. Green*, 927 F.2d 1005, 1007 (7th Cir.), *cert. denied*, 502 U.S. 847 (1991); *see United States v. Street*, 66 F.3d 969, 978 (8th Cir. 1995) ("[N]or is the touchstone whether the officer is performing a function covered by his job description.") (citation omitted). In *United States v. Green*, the Seventh Circuit rejected the argument that the assaulted officers were not performing official duties when they dispersed a fight, merely because they "were prison food service workers rather than guards," since "the sweep of the phrase 'official duties'" extended beyond one's job functions to encompass broader duties shared by all prison employees, including "safekeeping, protection, and discipline." 927 F.2d at 1007–08. And in *United States v. Kelley*, the Fifth Circuit rejected a defendant's argument that an officer was not performing "official duties" when the officer stopped at the scene of a car accident, even though she was not a traffic officer but rather on her way to investigate credit card fraud, and

therefore defined "official duties" with reference to the officer's law enforcement role, rather than her particular job functions. 850 F.2d 212, 214–15 (5th Cir. 1988). Every Court of Appeals to address the issue has uniformly held that § 111(a)(1)'s "official duties" requirement extends beyond one's particular job responsibilities. *Cf. United States v. Hansen*, 599 U.S. 762, 772 (2023) (interpreting comparable terms in other provisions of "the federal criminal code").

Considering our precedent, comparable state-law formulations of official duties, and the complimentary construction of this term in other statutes, an "official duty" within the meaning of § 201(b)(2)(C) could seemingly encompass an obligation or responsibility beyond one's day-to-day tasks or functions. And that test would certainly cover Paitsel's conduct. But we need not definitively adopt that test because, in this case, it suffices for Paitsel's conduct to fall within his official duties that he performed an act made possible only by both (i) his official position in the FBI that gave him access to a specialized FBI database, and (ii) his affirmative representation while using that database, as required by law, that his conduct was part of official FBI law enforcement investigative duties.[5]

**2.**

Applying this definition, Paitsel's sufficiency challenge fails. It falters even if we assume without deciding that the

---

[5] *United States v. Fernandez*, No. 19-15044, 2022 WL 3581793 (11th Cir. Aug. 22, 2022) (per curiam unpublished op.), is not to the contrary. There, the Eleventh Circuit stated that "[a]lthough the term 'official duty' is not statutorily defined, its ordinary meaning encompasses a public official's job responsibilities as dictated by governing statutes, rules, and regulations." *Id.* at *4. But this

Government may not satisfy its burden with ethics regulations applicable to all federal government employees, as Paitsel insists. He has not shown that no rational trier of fact could find that, based on the evidence presented, Paitsel violated an obligation relating to, and required by, his position as an FBI agent.

The CLEAR permissible-use warning and related testimony were sufficient to allow a jury to find that Paitsel had an official duty to comply with the CLEAR permissible uses, which included using the system for only official business. The admission of the warning screen and testimony together supplied enough evidence from which a reasonable factfinder could conclude beyond a reasonable doubt that Paitsel, in his role as an FBI Special Agent, had an official duty to comply with the terms and conditions of using the CLEAR system, which were required by federal statute. *See supra* Part I.

Specifically, the Government presented evidence that legal restrictions on the dissemination of PII, specifically the GLBA, require Thomson Reuters to place "restrictions on how that data can be used," including that users must identify a "permissible purpose[] in order to be a client of CLEAR." D.A. 485.[6] The FBI's version of CLEAR contains a greater level of

---

statement was *dictum*. In *Fernandez*, the Eleventh Circuit affirmed because the appeal solely challenged the District Court's refusal to instruct the jury on "official duty" using the statutory definition of "official act," as those terms are clearly distinct. *Id.* It thus had no occasion to define "official duty," because it merely needed to affirm the District Court's rejection of defendant's proposed instruction.

[6] The dissent accuses us of rewriting the indictment to "charg[e] an offense that was never alleged" and substituting ourselves for "a jury who was not required to, and did not, make any findings about Paitsel's compliance with the Gramm-Leach-Bliley Act."

access to data because the FBI is a law enforcement agency, and government investigations are a statutorily permitted use of such data. D.A. 483–87. As part of his role, Paitsel was trained that CLEAR is used for official business only. Paitsel's ability to access CLEAR was inextricably tethered to and dependent on his position as an FBI agent, and his affirmative representations that searches performed were part of his law enforcement investigation work. That rendered it part of his official duty, just as, as defense counsel conceded at argument, "any FBI agent who misuses his badge for private purposes" could be found to have violated his official duty. Oral Arg. 35:55–37:32.

This is true even though it is undisputed that Paitsel did not use CLEAR as part of his job description. That is because even if the database was not part of his day-to-day functions,

---

Dissenting Op. 7. But the indictment alleged that CLEAR's permissible use screen existed "[t]o maintain compliance with the privacy provisions of the federal Gramm-Leach-Bliley Act," D.A. 71; evidence about the GLBA requirements was presented to the jury without objection; and the Government argued to the jury in closing that CLEAR "can be used only for specific purposes" under federal law, including the GLBA, D.A. 1012, such that Paitsel "lied every single time" he accessed CLEAR and affirmed that "he was logging into CLEAR for use complying with federal, state, or local laws," D.A. 1012–13. The Government further argued (over no objection) that the jury should find that Paitsel violated his official duty "because he lied every time he ran a search in CLEAR, which he had special access to because he was an FBI agent." D.A. 1106. Furthermore, Paitsel's argument to the jury, as well as his briefing to us, did not contest that his misrepresentation that he sought to access CLEAR for law enforcement purposes violated the GLBA. As already stated, "our limited determination on sufficiency review does not rest on how the jury was instructed, but rather on how a properly instructed jury would assess the evidence." *Hillie*, 14 F.4th at 682 (citation modified).

Paitsel's occupation gave him access to CLEAR, D.A 440–44, and he manipulated the privileges provided by his official role to derive information from the database by misrepresenting that he was searching it for law enforcement purposes, S.A. 17–19; D.A. 499, 517. CLEAR related to Paitsel's official role because his status as an FBI agent not only gave him access to the database in the first instance, but also imposed responsibilities on his use of the system. D.A. 487–93. Federal law requires that Paitsel access CLEAR only for a permissible purpose. Notwithstanding his role as an FBI agent, Paitsel was not authorized to search for tenant information in the database absent a legitimate law enforcement purpose. He nevertheless did so, taking actions that falsely averred that he was accessing the restricted database for specifically—and wrongly—identified law enforcement purposes.

Furthermore, as testified to at trial without objection, Paitsel's access to CLEAR violated the GLBA, as well as specific FBI training, instructions and regulations about access to FBI databases. D.A. 440–49, 499–500, 505–06. This neutralizes Paitsel's argument that he violated only a vague ethical duty. His access was an affirmative action that violated a federal statute, the GLBA, and FBI regulations. For that reason, as well as the other reasons outlined above, Paitsel violated an official duty by running searches for PII on the CLEAR database for personal profit after falsely representing that the searches were for official law enforcement investigative work—a representation without which he could not have obtained the PII material.

Paitsel also suggests that his disclosure of telephone numbers would not violate the GLBA, as such information is available to the public and thus not meaningfully understood as PII under the Act. *But see Trans Union LLC v. FTC*, 295 F.3d 42, 50 (D.C. Cir. 2002) (observing that GLBA regulations

include telephone numbers within definition of PII). Even if true, Paitsel also disclosed other PII to Bailey, including at least one tenant's Social Security number. *See* D.A. 619. Social Security information is indisputably non-public personal information as defined by the GLBA. It is "[i]nformation a consumer provides to [a financial institution] on an application to obtain a loan, credit card, or other financial product or service," 16 C.F.R. § 313.3(o)(2)(i)(A), that one would *not* have "a reasonable basis to believe is lawfully made available to the general public," *id.* § 313.3(p)(1); *see also Trans Union*, 295 F.3d at 50 (noting that regulatory definition of PII under the GLBA encompasses Social Security numbers). In fact, federal law restricts the release of Social Security information absent an individual's consent, even imposing criminal liability for certain such disclosures. *See* 5 U.S.C. § 552a(b), (i). Paitsel's transmission of a tenant's Social Security number to Bailey thus independently sufficed to establish a violation of his official duty.[7]

It is also immaterial that the PII on CLEAR was derived from information collected by private third-parties, like credit

---

[7] The dissent does not dispute that Social Security numbers are PII, but instead contends that the evidence presented at trial regarding Paitsel's disclosure of Social Security information must be ignored because the indictment did not specifically mention such a disclosure, nor did the jury instructions. Dissenting Op. 10. But the indictment alleged disclosures beyond merely telephone numbers as the dissent claims, to encompass the provision of "non-public information that PAITSEL obtained using FBI resources" more generally, D.A. 73, and "personal contact information, including" (but not limited to) "telephone numbers and email addresses," D.A. 74. In any event, the indictment plainly alleges that Paitsel conveyed to Bailey the same tenant's "date of birth," D.A. 81, which was proven at trial, D.A. 619, and which the Thomson Reuters witness testified constituted PII, D.A. 513–14.

companies. *See* D.A. 483, 494–95. *Valdes* strongly suggested that "searching several police databases to supply otherwise publicly available information to" a private party constituted a violation of one's official duty. 475 F.3d at 1320, 1327; *see supra* Section III.B.1. Moreover, a private entity's access to PII—for instance, a bank's knowledge of one's name, contact information, and account number, *see* D.A. 483–84—does not render it publicly available information. The GLBA's implementing regulations acknowledge that consumers regularly provide financial institutions with PII, including "[a]ccount balance information" or "[i]nformation from a consumer report," like contact information. 16 C.F.R. § 313.3(o)(2)(B), (G). But that information is still "nonpublic" under the Act, because it is not available to the *general* public. *Id.* § 313.3(n)(1).

The dissent argues that our ruling "authorizes private companies to define the offense through contractual restrictions on those using its products." Dissenting Op. 1–2 &

n.3.[8,9]  But as already articulated, it is *federal law* which restricted Paitsel's access to the information that he shared, and his ability to discover that information was granted by virtue of his position as an FBI agent with credentials to access CLEAR along with his affirmative representation that he was acting in an official FBI investigative capacity in undertaking the searches. *See United States v. Parker*, 133 F.3d 322, 326 (5th Cir. 1998) (upholding indictment under § 201(b)(2)(C) for fraudulent use of computer system, holding that "official act" under the statute "encompasses use of governmental computer

---

[8] As stated, the dissent's concerns are unfounded given that Paitsel violated his official duty by transgressing federal law in falsely claiming that he was engaged in law enforcement work and by misusing his law enforcement credentials to do so.  That is far more than a mere contractual-use restriction.  This alone distinguishes *Van Buren v. United States*, where "the search breached department policy" but did not violate an independent federal law.  593 U.S. 374, 380 (2021).  Moreover, unlike Van Buren, Paitsel did not "obtain information that . . . [was] otherwise available to [hi]m," *see id.* at 378, as his access was restricted to law-enforcement purposes by a federal statute.  While the dissent urges that *Van Buren* refutes our conclusion that Paitsel violated the GLBA, Dissenting Op. 2 n.3, 5 n.6, the cited analysis centers on concerns that the relevant statutory clause "criminalizes every violation of a computer-use policy," 593 U.S. at 394, as Van Buren was convicted for violating user requirements imposed by policy (as opposed to a federal statutory requirement).

[9] *United States v. Safavian*, where we declined to hold that a federal employee who refused ethical advice pursuant to a "voluntary system" did not "impose[] a duty on those seeking ethical advice to disclose" relevant information or be subject to criminal liability, also presents a distinct set of facts.  528 F.3d 957, 964 (D.C. Cir. 2008).  There, "the government failed to identify a legal disclosure duty except by reference to vague standards of conduct for government employees." *Id.*  Here, the ruling is premised on a violation of federal law.

systems to fraudulently create documents for the benefit of the employee or a third party for compensation, even when the employee's scope of authority does not formally encompass the act").

If Paitsel, instead, had walked into a bank, flashed his credentials, and falsely claimed that he was engaged in a law enforcement investigation and demanded to see a client's files for his personal purposes, that conduct surely would have breached Paitsel's official duties. The only difference here is that the FBI's restricted database brought the bank to Paitsel. Neither Paitsel nor the dissenting opinion explains why that technological convenience makes Paitsel's conduct any less a breach of official duty. Sure, other non-governmental entities—credit companies, fiduciaries, and the like—could contract with Thomson Reuters to obtain such information for a federally permissible purpose and themselves break the law to sell that information to Bailey. Perhaps such conduct might incur criminal liability under other statutes. But that possibility does not detract from Paitsel's own official duty to access the CLEAR database solely for permissible purposes under federal law.

The Government thus presented sufficient evidence from which a reasonable factfinder could find that Paitsel had an official duty to use CLEAR for only official purposes, which he violated by searching for tenants' information for his and his friend's personal financial advantage.

**3.**

Paitsel wrongly argues that this reading expands criminal liability under 18 U.S.C. § 201. Similarly, the dissent catastrophizes that after today's decision, any federal employee who accesses a "restricted database[], and disregards the company's contractual use restriction posted on a

screen . . . expecting—or being promised—a box of chocolates or a bottle of wine—. . . will have committed the federal criminal offense of bribery, punishable by up to fifteen years' imprisonment."  Dissenting Op. 1.

These arguments overlook that the bribery statute requires proof beyond a reasonable doubt of other elements, which are defined more narrowly.  First, the dissent disregards the requisite *mens rea* requirement under the statute.  To prove a violation of the statute, the government must show beyond a reasonable doubt that the defendant "corruptly demand[ed], s[ought], receive[d], accept[ed], or agree[d] to receive or accept anything of value."  18 U.S.C. § 201(b)(2).  As discussed *supra* Section III.A, "bribery requires that the official have a corrupt state of mind and accept (or agree to accept) the payment intending to be influenced in the official act."  *Snyder*, 603 U.S. at 11.  Intent is unquestionably a higher *mens rea* standard than reckless disregard.  *See United States v. Smith*, 104 F.4th 314, 328 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 1478 (2025) ("[F]ederal courts are uniform that an 'intentional' *mens rea* does not include reckless conduct.").

Second, as we explained in *Valdes*, our bribery scheme "defines the predicate acts broadly, but the required compensatory link narrowly," such that "the payment at issue must actually influence the act or omission," a high bar for the Government to clear.  475 F.3d at 1327.  Even assuming that the weighty *mens rea* requirement were satisfied, unless a box of chocolates or a bottle of wine was *the* incentive which "actually influence[d]" the violation of an official duty, there would be no criminal liability under § 201.

Third, what firmly renders Paitsel's conduct a criminally punishable violation of an official duty here is not mere transgression of a private entity's "contractual-use restriction,"

but the federal laws and regulations requiring such a restriction. *See supra* Part I & Section III.B.2. While true that "the screen purporting to limit Paitsel's use of CLEAR" was not itself a federal law, but rather "a notice from Thomson Reuters" that a permissible use of the database was required under federal law, Dissenting Op. 8–9, this distinction makes no difference here. Thomson Reuters may only disseminate certain information in CLEAR to those with permissible reasons for accessing such information, and the basis for that restriction is Congress's stated goal of protecting consumer information derived from financial institutions, embodied in the GLBA. (Not "terms dictated by a private entity," *id.* at 9, as the dissent suggests.) As he himself concedes, Appellant's Br. 10 ("Privacy legislation relating to some of the information that CLEAR assembles requires CLEAR clients to confirm that they are using that information only for certain permissible purposes."), Paitsel was not entitled to access tenants' private information and thus misused his law enforcement status to circumvent Thomson Reuters's implementation of Congress's requirements.

Ultimately, subsection 201(b)(2)(C) does not criminalize any violation of an official duty, but rather only does so when the other elements are met. They are here.

"Of course, if the action desired is *entirely unrelated* to the subject matter over which the officer has a general duty, no bribery can be committed." 3 WHARTON'S CRIMINAL LAW § 43:9 (16th ed. 2021) (emphasis added); 5 CYCLOPEDIA OF L. & PROC. 1041 (7th ed. 1901–1912) ("[I]t has been held no offense to offer a bribe for an act entirely outside the officer's official function."). Those concerns have no purchase in this case where the defendant was able to access an official, statutorily restricted FBI database solely by virtue of his official position and his affirmative representation that his

searches were for official FBI investigative purposes.  So this case bears no resemblance to Paitsel's concerns about federal employees being held liable for sharing information from a public telephone book in exchange for payment.  Such conduct has no relation to an FBI agent's general duties.  (And, in any event, the GLBA's implementing regulations do not protect numbers located in telephone books from disclosure because that information "is lawfully made available to the general public."  16 C.F.R. § 313.3(p)(1), (p)(3)(iii)(B) (exempting information from a telephone book).)

**4.**

Our ruling also continues to give full effect to every provision of § 201 and our binding *en banc* precedent, notwithstanding the dissent's contrary contentions.

The dissent first says that our early cases "stand for the proposition that 'official duty' consists of performing 'official acts.'"  Dissenting Op. 4.  The prose of these opinions refers to "acts official in character," *Thomson*, 37 App. D.C. at 467, but the decisions predate the enactment of 18 U.S.C. § 201, which for the first time defined distinct offenses based on violations of an "official act" or an "official duty."  As such, those rulings cannot overrule Congress's later choice to enact a statute setting forth several discrete offenses.  To hold that an "official duty" is made up solely of "official acts" would render nugatory the official duty offense, 18 U.S.C. § 201(b)(2)(C), since all such conduct would be charged as official act bribery under § 201(b)(2)(A).  *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute.  We are thus reluctant to treat

statutory terms as surplusage in any setting.") (citation modified).[10]

Collapsing official duty bribery into official act bribery would also run counter to our *en banc* precedent interpreting the statute otherwise. *See Valdes*, 475 F.3d at 1327 ("[T]he bribery provisions cover two *additional* predicate classes" beyond official act bribery under § 201(b)(2)(A), including § 201(b)(2)(C)). The dissent's reliance on § 201(a)(3), which defines "official act"; *McDonnell*, 579 U.S. at 566, which concerned "the proper interpretation of the term 'official act'" as defined in § 201(a)(3); and the ultimate holding in *Valdes*, concerning an official act gratuity conviction, is unavailing. *See* Dissenting Op. 4–6 & n.7. This is not an official act case.

Recall that in *Valdes*, we reversed Valdes's conviction for receiving a gratuity, holding that conduct akin to that at issue here did not constitute an official act within the meaning of § 201. 475 F.3d at 1330. Gratuity under § 201(c)(1)(B) is a lesser-included offense of "official act" bribery under § 201(b)(2)(A) and carries a lesser maximum penalty of two years' imprisonment, 18 U.S.C. § 201(c)(3), whereas bribery is punishable by up to fifteen years' incarceration, *id.* § 201(b)(4). Section 201 does not define a lesser-included offense for "official duty" bribery—that is, there is no "official duty" gratuity contained in the statute.

After *Valdes*, then, Paitsel could not be convicted of an "official act" offense for the alleged conduct in this case, which necessarily foreclosed prosecution under a gratuity theory. In other words, Paitsel cannot be guilty of the lesser "official act" gratuity offense, but is still properly convicted of "official

---

[10] Paitsel does not argue that "official duty" should be defined as coextensive with, or comprised of, conduct amounting to an "official act."

duty" bribery. Thus, the dissent's concern that our holding regarding the scope of "official duty" bribery does not comport with the scope of "official act" gratuity is meritless. *See* Dissenting Op. 4–6. The latter is not a lesser included offense of the former. To the extent that this outcome appears asymmetrical, as our *en banc* Court previously recognized, our role in correcting any perceived imbalance is circumscribed: "Judicial extension of those for the gratuity provision would disturb the balance Congress chose—which, of course, it is free to modify at any time." *Valdes*, 475 F.3d at 1328. "When Congress in 1962 reorganized the bribery statute and added an illegal gratuity offense, it could easily have made that provision perfectly mirror all of the predicate acts listed in the older bribery provision; instead, however, it chose to include only the 'official act' predicate . . . and *not* the 'fraud' or 'official duty' predicates . . . ." *Id.* Although the dissent charges us with "throw[ing] up [our] hands and blam[ing] Congress for the incongruity[,]" we must continue to respect the drafting decision of the legislature and our Court's prior interpretation of this statute.

Finally, our decision expressly relies upon the "official" nature of the § 201(b)(2)(C) offense, leaving open for another day how to discern the definition of § 201(b)(1)(C)'s lawful-duty offense, and the relationship between an "official duty" and a "lawful duty."

## IV.

For the reasons stated, we affirm Paitsel's convictions and sentence.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, dissenting:

The majority's decision in this case is enormously important because of its dire implications not only for the defendant David Paitsel but also for federal employees in general.

Throughout the federal government there are now more than 300,000 databases, nearly 2,000 of which are in the Department of Justice alone.[1]   Many are non-public and restricted, available only to federal employees in their respective offices (or chambers).  As in this case, a private company often owns and maintains the database, and dictates the terms of its use for federal (and private) subscribers.[2]

Now, as a result of the majority's ill-considered decision, any federal employee who logs onto one of these restricted databases, and   disregards the company's contractual use restriction posted on a screen, and, for instance, retrieves an article from a newspaper website, a case from Westlaw, or someone's telephone number for a friend, expecting—or being promised—a box of chocolates or a bottle of wine—now that federal employee will have committed the federal criminal offense of bribery, punishable by up to fifteen years' imprisonment.

This picture is profoundly disturbing.  The majority's decision converts ethical constraints into federal criminal offenses, and authorizes private companies to define the offense through contractual restrictions on those using their products. *See Van Buren v. United States*, 593 U.S. 374, 393-94 (2021);

---

[1] *See* Data.gov.

[2] Congress contemplated this private-public arrangement. *See* 44 U.S.C. § 3511(a)(2)(E)(v)(III).

*United States v. Safavian*, 528 F.3d 957, 964 (D.C. Cir. 2008).[3]

**I.**

Paitsel's principal argument—that the evidence was insufficient to support his convictions—depends on whether the bribery statute, 18 U.S.C. § 201(b)(2)(C), covered his alleged conduct. It did not and we should have reversed his convictions.

The majority's opinion recognizes the Supreme Court's decisions holding that the crime of bribery under § 201 requires proof of a *quid pro quo*. Majority Op. 2, 9, 10, 11, 15. But that is about all the majority does—recognize the Supreme Court's decisions. The balance of the majority's opinion disregards what in this case is the most important part of the Supreme Court's definition of federal bribery law.

The Supreme Court has clearly delineated an essential prerequisite to finding that a governmental official has committed the crime of § 201 bribery. A bribe, the Court held, requires "a *quid pro quo*." *United States v. Sun-Diamond*

---

[3] As the Supreme Court observed in a related context, "the Government's interpretation of the statute would attach criminal penalties to a breathtaking amount of commonplace computer activity." *Van Buren*, 593 U.S. at 393. "Many websites, services, and databases . . . authorize a user's access only upon his agreement to follow specified terms of service. If the 'exceeds authorized access' clause [in 18 U.S.C. § 1030(a)(2)] encompasses violations of circumstance-based access restrictions on employers' computers, it is difficult to see why it would not also encompass violations of such restrictions on website providers' computers. And indeed, numerous *amici* explain why the Government's reading of subsection (a)(2) would do just that—criminalize everything from embellishing an online-dating profile to using a pseudonym on Facebook." *Id.* at 394.

*Growers of Cal.*, 526 U.S. 398, 404 (1999). A *quid pro quo* means "a specific intent to give or receive something of value *in exchange* for an official act." *Id*. at 404-05. The Court held the same in *McDonnell v. United States*, 579 U.S. 550, 574 (2016): "Section 201 prohibits *quid pro quo* corruption—the exchange of a thing of value for an 'official act.'"[4] And again in *Snyder v. United States*, 603 U.S. 1, 19 (2024): "§ 201(b), the bribery provision for federal officials" is violated when the official "accepts an up-front payment for a future official act . . .."

The majority cites several ancient federal court decisions. *United States v. Birdsall*, 233 U.S. 223, 230 (1914), which has never been overruled, held that "[e]very action that is within the range of official duty comes within the purview of" the bribery statute then in effect. Three years earlier our predecessor court held much the same: when "Congress used the term 'official function,' it had reference to acts official in character, something within the legal duty of the person performing them." *Thomson v. United States*, 37 App. D.C. 461, 467 (D.C. Court of Appeals 1911).[5] And in the *Fall* case, which the majority also cites, our court repeated a statement from *Thomson*: "There is no rule so uniformly adhered to by the courts, both State and Federal, as the one 'that there can be no bribery of any official to do a particular act, unless the law requires or imposes upon him the duty of acting.'" *Fall v. United States*, 49 F.2d 506, 510 (D.C. Court of Appeals 1931). As I read these decisions, they stand for the

---

[4] It is "the corruption of official decisions through the misuse of influence in governmental decision-making which the bribery statute makes criminal." *Valdes v. United States*, 475 F.3d 1319, 1324 (D.C. Cir. 2007) (en banc) (quoting *United States v. Muntain*, 610 F.2d 964, 968 (D.C. Cir. 1979)).

[5] The majority opinion uses "D.C. Circuit" but that is not accurate.

proposition that "official duty" consists of performing "official acts."

Despite the Supreme Court's repeated definitions of § 201 bribery, the majority seems oblivious to the portion of the Court's interpretation of federal bribery law that matters most in this case. Namely, that the offense of bribery under federal law requires proof beyond a reasonable doubt that something of value was exchanged for an "official act." Our court too, ruling en banc, made what amounts to the same point: "both our precedent and the language of the statute make clear that § 201 is not about officials' moonlighting, or their misuse of government resources, or the two in combination." *Valdes v. United States*, 475 F.3d 1319, 1324 (D.C. Cir. 2007) (en banc). That exactly describes the conduct for which Paitsel was wrongly imprisoned.

Section 201(a)(3) defines "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."

In *McDonnell*, the Court held that "an 'official act' is a decision or action on a 'question, matter, cause, suit, proceeding or controversy.' The 'question, matter, cause, suit, proceeding or controversy' must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is 'pending' or 'may by law be brought' before a public official." 579 U.S. at 574.

The question here is similar to that posed in

*McDonnell*—did Paitsel's retrieving of telephone numbers from CLEAR amount to "official acts" as the Supreme Court has interpreted the § 201 bribery provisions? The certain answer here, as in *McDonnell*, is no.

Our en banc decision in the *Valdes* case, concerning conduct indistinguishable from that of Paitsel, confirms as much. 475 F.3d 1319. We held that Valdes' use of a police website to match license plate numbers to individuals,[6] and his receipt of cash for doing so, did not constitute "official acts." And so we reversed Valdes' conviction for receiving a gratuity in violation of § 201(c). *Id.* at 1330.

As the majority opinion acknowledges, it follows from *Valdes* that Paitsel could not have been convicted of violating § 201(c) for accepting illegal gratuities, an offense punishable for a maximum of two-years imprisonment. *See* Majority Op. 38. But the majority sustains Paitsel's conviction for bribery, an offense punishable for a maximum of 15 years imprisonment.

On the face of it, this outcome is still another reason to reject the majority's conclusion. Our court recognized in *Valdes* that the offense of gratuity is a lesser-included offense of the crime of bribery. 475 F.3d at 1328. If Paitsel was not guilty of

---

[6] The factual setting of *Van Buren v. United States*—"a former police sergeant, ran a license-plate search in a law enforcement computer database in exchange for money"—is the same as that in *Valdes*. 593 U.S. at 378. The Supreme Court reversed Van Buren's conviction for violating the Computer Fraud and Abuse Act of 1986, 18 U.S.C. § 1030. The Court held that the provision "does not cover those who, like Van Buren"—and I add, those who, like Paitsel—"have improper motives for obtaining information that is otherwise available to them." *Id.* The analysis in *Van Buren* refutes the majority's notion that Paitsel violated some "federal law" by accessing CLEAR. *Id.* at 393-94.

the lesser offense, how could he be guilty of the greater offense? My colleagues give no answer—and there is none. Instead they throw up their hands and blame Congress for the incongruity their decision creates.

To sum up, the Supreme Court's interpretation of federal bribery law is that, without an official act there is no *quid pro quo*, and without any *quid pro quo* there is no crime of bribery under § 201. Thus, Paitsel would be guilty of violating his "official duty" only if he was performing "official acts," which he was not.[7] For these reasons alone, Paitsel's conviction for bribery (and hence for conspiracy to commit bribery) should be reversed.

## II.

Instead of following these Supreme Court decisions, the majority has devised some other theory—exactly what theory is unclear—in order to affirm Paitsel's convictions.

One thing we can discern is that the majority thinks its theory rests on the notion that Paitsel's "access" to CLEAR violated the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et seq.* Majority Op. 30-31. That notion comes out of the blue and is

---

[7] The majority asserts that this case is not "an official act case." Majority Op. 38. As I have explained above, that assertion flies in the face of the Supreme Court's decisions in *Sun-Diamond*, *McDonnell*, and *Snyder*, each of which held—as the Court stated in *Sun-Diamond*—that the crime of bribery in § 201 requires "a specific intent to give or receive something of value *in exchange* for an official act." 526 U.S. at 404-05.

mistaken.[8] The Indictment did not charge Paitsel with any such violation and the district court, in its extensive jury instructions, did not instruct the jury to determine whether Paitsel violated the Gramm-Leach-Bliley Act. Indeed, the court's jury instructions never even mentioned that Act.

My colleagues have thus taken upon themselves the role of a grand jury, charging an offense that was never alleged, and the role of a trial judge who never gave an instruction dealing with this statute, and the role of a jury who was not required to, and did not, make any findings about Paitsel's compliance with the Gramm-Leach-Bliley Act.

These considerations, in addition to those in part I, above, are more than enough to condemn the majority opinion. But I cannot let slide the majority's many other errors.

---

[8] Inscrutable too is the majority's digression about state court bribery cases, most of which are more than 100 years old. Of its eleven state cases, some dealt with state statutes and the rest were state common law criminal decisions. Yet ever since 1812 it has been established that, unlike state courts, federal courts cannot exercise common law criminal jurisdiction. *United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32 (1812). And while Congress can use "common-law term[s] in a statute," Majority Op. 22 (quoting *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 101 (2011)), the majority's cases do not define "official duty" and § 201 does not "simply punish[]" bribery, *id.* at 21 (quoting *Carter v. United States*, 530 U.S. 255, 267 n.5 (2000)). Congress therefore did not "leav[e] the definition of [the offense] to the common law." *Id.* (quoting *Carter*, 530 U.S. at 267 n.5). In any event, my colleagues do not indicate whether their ancient state court cases are still good law. Their omission is understandable. Attempting to update the century-old bribery laws in those eleven states would be a fool's errand. The cases have nothing at all to do with the issues now before us.

At the center of the case is CLEAR, an online platform owned and maintained by a Canadian company, Thomson Reuters Corporation. The company sells CLEAR to private users such as financial institutions, collection agencies and law firms, and to governmental entities like the FBI and the Department of Homeland Security. As with all users of CLEAR, the FBI pays a fixed fee for the information on CLEAR about individuals in the company's database. Thomson Reuters compiles this information from many sources, public and private.

An opening screen on CLEAR states that in order for Thomson Reuters—*for the company*—to comply with the Gramm-Leach-Bliley Act, the user must identify a "permissible purpose" before using the company's database. The Gramm-Leach-Bliley Act regulates financial institutions and their disclosure of information about their customers. 15 U.S.C. § 6802(a).[9] Although one would hardly know this from the majority's opinion, the Gramm-Leach-Bliley Act is not a criminal statute. It is a civil statute and it is enforced through civil regulatory measures. *See* 15 U.S.C. § 1605.

The majority opinion states that "Federal law require[d]" Paitsel, in order to use CLEAR, to identify his "permissible purpose." Majority Op. 30. The majority's assertion, even if it mattered, is mistaken and misleading. The screen purporting to

---

[9] The majority opinion quotes this part of the Act: "a nonaffiliated third party that receives from a financial institution nonpublic personal information" may not disclose the information except in limited circumstances. Majority Op. 5 (quoting 15 U.S.C. § 6802(c)). The majority seems to think this provision applied to Paitsel. It did not. Paitsel did not receive information from a "financial institution," as defined in 15 U.S.C. § 6809. He received information from Thomson Reuters, which is not a financial institution.

limit Paitsel's use of CLEAR was not a "federal law," as the majority asserts. It was a notice from Thomson Reuters. And contrary to the majority's contention, this notice was not a mere "implementation of Congress's requirements" regarding nonpublic information. Majority Op. 36. The CLEAR warning screen is overbroad and covers information that Thomson Reuters obtained from sources other than financial institutions.

The majority opinion thus renders application of a federal criminal statute dependent on terms dictated by a private entity, in this case a foreign corporation.

The majority makes a related error in describing the information Paitsel retrieved from CLEAR and turned over to Bailey.[10] (Again it is not clear why the majority thinks the nature of the information matters.)

The "information," as charged in the Indictment, consisted of "personal contact information" or "contact information" from CLEAR. D.A. 76, 77, 78, 79, 81. In each of the instances set forth in the Indictment, this "information" was a telephone number. *Id.* CLEAR contains information from many sources other than regulated financial institutions. No one knows whether the "contact information" Paitsel obtained and gave to Bailey—telephone numbers of apartment tenants—came from financial institutions. A senior manager from Thomson Reuters testified at trial that telephone numbers are not "personal identifying information," contrary to what the majority opinion now asserts. That testimony is the only evidence on this subject

---

[10] Bailey's use of that information was for a permissible purpose under District of Columbia law.

the jury had before it.[11]

The majority comes up with another idea. Now we are told that Paitsel disclosed to Bailey "at least one tenant's Social Security number." Majority Op. 31.

But the Indictment charged Paitsel only with disclosing "personal contact information," that is, telephone numbers. The Indictment did not mention Social Security numbers. To state the obvious, having a person's Social Security number would not enable anyone to contact that person. And the trial judge's jury instructions never mentioned anything about Paitsel disclosing Social Security numbers.

---

[11] The majority opinion cites *Trans Union LLC v. FTC*, 295 F.3d 42, 50 (D.C. Cir. 2002), a decision upholding a regulation (16 C.F.R. § 313) said to include telephone numbers as "nonpublic personal information" under 15 U.S.C. § 6809(4)(A). Another part of the regulation now states that telephone numbers may not be so described. 16 C.F.R. § 313.3(p)(3)(ii). In any event, the jury was not made aware of any of this and the only evidence it had came from the testimony of the Thomson Reuters manager recounted in the text.